Helen Orlowski v. Commissioner.
Orlowski v. Commissioner
Docket No. 16181.
United States Tax Court
1949 Tax Ct. Memo LEXIS 237; 8 T.C.M. (CCH) 276; T.C.M. (RIA) 49060; March 22, 1949
*237 Llewellyn A. Luce, Esq., for the petitioner. William H. Best, Esq., for the respondent. VAN FOSSAN Memorandum Opinion VAN FOSSAN, Judge: The respondent determined deficiencies in the petitioner's income tax liability and imposed 50 per cent penalties as follows: Year
Deficiency
50% Penalty
1942
$ 5,166.98
$ 2,583.49
1943
5,128.98
2,564.49
1944
3,844.50
1,922.25
1945
7,147.55
3,573.58
* ($ 3,573.78)
$21,288.01
$10,643.81
($10,644.01)
By amended answer respondent makes claim for increased deficiencies and penalties for all the years in controversy. The issues, generally stated, are: (1) whether the respondent erroneously determined that the petitioner did not report her full net income realized from the operation of her taproom business, and from other sources, during all the taxable years, and (2) whether the petitioner filed false and fraudulent income tax returns for each of such taxable years as contemplated by section 293 (b) of the Internal Revenue Code. In her pleadings the petitioner conceded that she had failed to report, in each of the taxable years, *238 certain receipts from juke boxes and in 1942 and 1945 her profits derived from horse race betting, and that certain expenses claimed in each year were properly disallowed by the revenue agent. Specifically, the petitioner controverts the respondent's action in estimating her income derived from the sales of wine, beer and spirits, due to his failure to allow for loss of beer through tapping, leakage, and drawing; for free drinks given to customers; for free drinks consumed by employees and musicians; and due also to his use of wrong selling prices and improper container sizes as the basis for computing profits on sales. [The Facts] The petitioner resides in Wilmington, Delaware, and filed her income tax returns for the taxable years with the collector of internal revenue for the district of Delaware. She operated a taproom in Wilmington known as the Tiger Cafe, hereinafter called the Tiger, and located at 215-217 East Front Street, Wilmington, in a community frequented by working men, railroaders and shipyard employees. She is Polish and although she speaks English very poorly, she is a woman of much business ability and keen understanding. The Tiger served beer in bottles, *239 beer on draft, and wine and whiskey by the glass. It also served sandwiches and hard-shelled crabs. It employed an orchestra for dancing three nights a week. It was located opposite the Front Street Pennsylvania Railroad Station and a block and one-half from the mair gate of the Pusey & Jones Shipyard Company. There were numerous competing taprooms and bars in the vicinity of the Tiger. During the taxable years the petitioner dispensed, without receiving payment there for, approximately one gallon of whiskey weekly to her employees, bartenders and musicians and also one out of four drink of beer, wine and whiskey to customers, a "drinks on the house" for cultivating good will and for advertising. As an average out of every 20 drinks of spirits sold by the petitioner, only one was of good whiskey Eighty per cent of the bottled beer sole was of the Diamond brand. In serving draft beer the loss due to tapping, leakage and drawing was at least five per cent of the sales. The petitioner's prices of spirits, wine and beer during the taxable years were as follows: Size of
Drinks
or
Bottle
1942
1943
1944
1945
Spirits
Cheap whiskey
1 oz.
$0.15
$0.15
$0.20
$0.20
Good whiskey
1 oz.
.25
.25
.30
.30
Draft beer
.05
(8 oz.)
.05
(8 oz.)
.10
(14 oz.)
.10
(12 oz.)
Case beer (bottled)
Diamond
12 oz.
.10
.10
.15
.20
Hornungs, Stockle, etc.
12 oz.
.15
.15
.20
.20
Wine
2 oz.
.10
.10
.15
.25
*240 The above prices in 1942 and 1943 were about the same as in surrounding taprooms in the area in which the Tiger was located. The petitioner's price for draft beer was less than that of most of her competitors. The O.P.A. regulations governed maximum prices and the Delaware Retail Liquor Association attempted to induce retailers to maintain a minimum price. However, during 1942 and 1943, the petitioner continued to charge five cents for an eight ounce glass of draft beer. The gross amounts in gallons of spirits charged to the petitioner by the Delaware Liquor Commission and the cost thereof during the taxable years were as follows: Charged
as Sold -
Year
D.L.C.
Cost
1942
696.25
$7,171.37
1943
538.65
6,356.07
1944
385.50
5,458.68
1945
383.65
8,719.73
The gross amount of draft beer charge to the petitioner and the cost were as follows: Charged
Year
as Sold
Cost
1942
16,188.88
$ 9,713.33
1943
16,128.62
9,677.17
1944
15,933.44
9,650.06
1945
17,854.52
10,712.71
The total number of bottles of beer sold and the cost thereof were as follows: Year
Sold
Cost
1942
21,744
$1,630.80
1943
21,888
1,641.60
1944
23,232
1,742.40
1945
30,576
2,293.20
*241 The gallons of wine sold and the cost were as follows: Year
Sold
Cost
1942
33
$59.40
1943
19.40
34.92
1944
27
48.60
1945
24.95
44.91
During the taxable years the Delaware Liquor Commission, to which the petitioner made reports as required by law, regarded as sold all bottled spirits and beer which had been opened and its reports made no allowance for spirits or beer given to employees, musicians, served free as a "good will" token or for losses through tapping, leakage and serving. The petitioner had no bookkeeper but with the assistance of her daughters kept her own records. Each night (occasionally on the following morning) the petitioner and her daughter counted the receipts of the day and noted the amount thereof on a slip of paper. She then transferred such amount to a memorandum covering the week. She entered the weekly totals on a "long slip" which contained the aggregate receipts for the entire year. She presented the "long slips" and all other records and evidences of receipts and payments to the man who made out her tax returns. He was neither a lawyer nor an accountant. The petitioner showed the examining internal revenue agent the *242 weekly lists in her possession and one of the "long slips." She also showed to him whatever other records she had relating to her receipts and disbursements. As an accommodation to her patrons the petitioner cashed large numbers of their pay checks. She kept a brown bag containing usually about $2,500 for this purpose. She deposited the cashed checks in her checking account with the Security Trust Company of Wilmington, Delaware, and withdrew from that account amounts to replenish the cash in the brown bag. Many hundreds of checks were so cashed and in substantial amounts. The petitioner's daughter, Tessie Barbara Hay, did not use cash from the cash register for cashing checks but obtained it from her mother. The petitioner's daughter, Sophie Layton, counted the money and made deposits for her mother. Current bills were also paid from the cash in the brown bag. The petitioner's husband, Frank, came to America some time between 1880 and 1885. In 1906 or 1907, while living in Alabama, Frank lost the money which he had deposited in a bank and became distrustful of all banks. He obtained a trunk and placed therein the savings which he was accumulating in order to provide homes for *243 his daughters. He also deposited in it the savings contributed by his daughters. He kept his trunk in his home. He died in 1930. The key to the trunk was lost and the petitioner left the money in the trunk from 1930 to 1938. In the latter year, a fire occurred in her home causing her to become apprehensive of the safety of the funds. She then opened the trunk and found four envelopes containing an aggregate of $19,000 in cash and marked in Frank's handwriting on each envelope the name of a daughter. The amounts so found and marked were Sophie Orlowska, $5,000; Tessie Orlowska, $4,000; Yadvega Orlowska, $6,000; and Wanda Orlowska, $4,000. By marriage the daughters became Sophie Layton, Tessie Hay, Hattie (Yadvega) Harrington and Wanda Hall, respectively. In accord with the custom among Polish families, the daughters while at home gave their pay to their parents. When they worked in other cities they sent home to their parents a large portion of their earnings. The daughters began to work at 14 or 15 years of age. At times they made as much as $42.50 a week. After the fire the petitioner first placed the $19,000 in a safety deposit box and then began to deposit, in her own name, *244 in various savings banks, the funds found in the trunk. At the time, the maximum deposit allowed was $200 to $250 a month and, subject to that limitation, she continued to make such deposits as fast as they were accepted by the banks. In 1943 the petitioner conveyed to Wanda Hall and her husband the title to a house at 504 South Van Buren Street at a value of $1,600. The petitioner still has $2,400 belonging to her daughter Wanda. In 1945 the petitioner purchased for Hattie Harrington a house for $6,000. In 1946 she purchased a house and grocery at Sixth and Harrison Streets for her daughter, Tessie Hay, for $12,500, of which $4,000 was from the fund originally in the trunk and the remainder was paid by the petitioner. In 1946 the petitioner purchased for Sophie Layton a house at 414 West Third Street for $7,100, of which $5,000 was from the "trunk fund" and the remainder paid by the petitioner. The petitioner took title to the Tessie Hay property to protect some of her own money contributed toward the purchase. She also took title to the Sophie Layton property because her daughter and her husband were drinking too freely. In her petition the petitioner admitted that she had failed *245 to include in her income tax returns for the taxable years the following receipts: 1942
1943
1944
1945
Unreported juke
box receipts
$ 180 $180 $180
$ 180.00
Unreported profits
from horse race
betting
5,000
2,000.00
Capital gain on
Warner Brothers
stock
649.84
She also agreed that expenses amounting to $581.36; $770.50; $732; and $774.07, claimed on her returns for the years 1942, 1943, 1944 and 1945, respectively, were properly disallowed and added to income as reported. In her income tax returns for the respective taxable years the petitioner reported the amounts of $2,302.92; $3,075.20; $3,325.50 and $3,811.08, respectively, as the net profits from the taproom. The respondent "reconstructed" the petitioner's income by assigning to her sales the following prices as applicable to all taxable years: Item
Size
Price
Whiskey
1 ounce
$0.25 (1942)
.30 (1943)
.35 (1944-45)
Wine
2 ounces
.25 (all years)
Beer (draft)
12 ounces
.10 (all years)
Beer (bottled)
Bottle
.20 (all years)
The respondent allowed a deduction of $2,000 a year to cover "personal use and waste." By this *246 method the petitioner's income from the taproom was determined to be $14,945.50; $12,491.78; $9,969.51, and $14,509.18 for the respective years. In his notice of deficiency the respondent added as "business income" the resulting increase from his computation of the profit on the above basis with the explanation, "income from taproom was understated as follows." In his computation of capital gain from the sale of the Warner Brothers stock in 1945, he added the sum of $649.84. The revenue agent testified that he had found no books and records to support the figures that the petitioner reported on her returns. He then proceeded to "reconstruct" her income from the taproom in the manner above set forth, allowing the deductions claimed by her, with minor changes, and adding the gain of $649.84 from the sale of Warner Brothers stock. The respondent submitted a statement purporting to show the increase in the petitioner's net worth during the taxable years. The record adequately explains the apparent increase in petitioner's net worth. Part of the deficiencies in income taxes due for the years 1942 and 1945 is due to fraud with intent to evade tax. [Opinion] In this case the *247 issues are simple but the record is complex. We are confronted with the situation usually encountered when a taxpayer keeps inadequate accounts. Petitioner's system was homemade and of the crudest sort. Faced with this fact, the respondent undertook to estimate her income. Taking such data as were made available to him, the revenue agent made an elaborate computation of the probable drinks sold and the amounts of the total sales of liquor, beer and wine. Having the official state records of the amounts of the purchases of such items and the cost thereof, he proceeded to compute gross profit, and, in turn, net profit. The figures so arrived at being greater than the profit returned by taxpayer and certain items of income which were not reported being unearthed, deficiencies were determined and fraud penalties imposed. Taxpayer filed her petition attacking the determination in both aspects and eventually an extended hearing was held before the Court. At the hearing taxpayer clearly demonstrated by credible testimony that the recomputation made by respondent, admitting it to be a proper approach to the problem, was erroneous because of the employment of certain erroneous factors and *248 the failure to take into account other important factors. Taxpayer went further and, assuming the basic soundness of respondent's method of approach, undertook to supply more accurate factors which, when used in respondent's computation, were calculated to give a more nearly correct result. Taxpayer, in her petition, admitted the omission of certain items of income and the correctness of respondent's action in disallowing certain deductions, with the consequence that there is no dispute over the amount of deductions allowable. On brief the parties set up elaborate computations giving widely varying results. Respondent adhered to his origial computation, giving little or no effect to the testimony. He also bases argument on alleged increases in petitioner's net worth, here again giving little effect to the testimony produced on behalf of petitioner. Petitioner's computation, admittedly based in large part on approximations, differs widely from her tax returns. Considering the whole situation it is clearly obvious that mechanical accuracy is impossible in this case. Any result is bound to involve many approximations and to be, in one sense, arbitrary. In such a situation the duty of *249 the Tax Court is to apply its best judgment and make such an approximation to an equitable result as it reasonably can, bearing most heavily on him whose fault is responsible for the inaccuracies and shortcomings of proof. Having exhausted every resource in attempting to apply mathematics and logic to a situation that defies precision, on the record made, we have made the following approximations and find that petitioner's net income as reported should be increased by the following amounts: 1942
$8,796
1943
4,362
1944
3,278
1945
4,910
In determining the above amounts we have given effect to the various factors erroneously fixed or omitted from use by respondent in his calculations and have included the amounts of income admittedly omitted by petitioner from her returns. We have also taken cognizance of the deductions which petitioner concedes were properly disallowed. The result is in some respects arbitrary but it represents our best practical judgment in a difficult situation. There remains the issue of fraud, the respondent having determined fraud as to each year. Petitioner resists such a finding for any year. In our judgment, respondent must prevail *250 as to the years 1942 and 1945. In each of these years petitioner won large sums of money by betting on horse races. The testimony is that at the very moment of cashing the winning tickets, petitioner was conscious of the probable tax liability and asked the man at the window if she had to report the winnings as income. The reply of the cashier implicitly advised her that they were taxable but that nobody returned them for taxation. She also consulted a woman lawyer (now deceased) and was advised, "Well, if you want to, you can put in the income tax, but if you lost, you can't tell how much you lost or how much you win. Better don't put it." Thus it is evident that petitioner was fully conscious of the tax responsibility involved. That she made up her own mind, after receiving the above advice, not to return her winnings, is the only reasonable deduction from the further record. So far as the record speaks, when she came to making up her tax returns, petitioner remained silent as to her race track operations and allowed her tax adviser to prepare the returns without revealing such income to him. This situation admits of only one conclusion, - petitioner deliberately, fraudulently and *251 with the purpose of evading taxes, failed to report taxable income for the years 1942 and 1945. As to 1943 and 1944, there is no record justifying a finding of fraud. Evidence of fraud must be clear and convincing. The record as to those years cannot be so characterized. Decision will be entered under Rule 50. Footnotes
*. Obviously a mechanical error.↩